Jones *vs.* Lynds, agent of the Auburn State Prison, and others.

Where the agent of the state prison at Auburn, in 1834, with the assent of the inspectors, let to S. the labor of 60 convicts, for the term of five years from the first of the preceding November, who were to be chair makers or capable of learning that trade, and it was stipulated in the contract that S. should have the privilege of a renewal for the further term of five years provided he offered as favorable terms as any other responsible person; which contract was afterwards assigned to J. with the assent of the agent of the prison, on condition that J. would put in proposals under the notice which was then being published under the provisions of the act of 1837, and would offer for the labor of the convicts a sum not less than the former contract prices and to pay the balance due to the state from the previous owners of that contract; and J. in his proposals offered a sum equal to the old prices and also offered to secure the balance due from such previous owners, and added a further clause to his proposal, that he would give as much for the services of the convicts, all things considered, as should be offered by any other responsible person; which sum offered by J. including the balance due from the former owner was not equal to the sum offered by P. who also put in a proposal under the notice; *Held* that the offer of J. did not entitle him to a renewal of the contract, as he did not offer as much as P. in addition to the payment of the balance due under the former contract; which balance he was bound to pay in order to entitle him to a renewal as the assignee of the contract.

To entitle the assignee of a contract to a specific performance thereof, he must do every thing which his assignor would have been bound to do if the contract had not been assigned; unless the person against whom the specific performance is claimed has relinquished his rights in favor of the assignee.

This was an application for an injunction to restrain the December 4. agent and keepers of the state prison at Auburn from permitting any of the convicts to labor for the defendants Parsons & Hewson, or for any other person except the complainant, at the cabinet or chair making business. It appeared from the bill and affidavits in the case that in March, 1834, Dunham, the then agent of the state prison, made a contract with John Seymour to hire and let to the latter, for five years from the first of November preceding, the labor of sixty convicts, fifty of whom were to be cabinet and chair makers and turners by trade or capable of being learnt that trade, and ten to be capable of doing such light or oth-

er work as could be done by convicts of the second class for strength and capacity, at certain prices per day specified in the contract, to be paid monthly ; in which contract William A. Palmer and two other persons became sureties for the contractor for the faithful performance of the contract. It was also mutually agreed between the parties to the contract that it should not be assignable without the consent of the agent of the prison, and that the contractor should have a preference of a renewal of the contract for the further term of five years, provided he should offer as good terms for the state as should be offered by any other responsible persons, and provided the agent should make such contract with any one. This contract at the time it was made by the agent was also assented to by the inspectors of the prison, by their written approval endorsed thereon. John Seymour the contractor continued to employ the convicts under the agreement, and performed all the covenants therein, until February, 1835. He then, with the verbal consent of the agent, assigned the contract to Jesse Seymour, and William A. Palmer one of the sureties, *upon condition* that they should fulfil and perform all the covenants and agreements which the assignor was therein bound to perform. These assignees continued to employ the convicts, under the agreement, until the 31st of August, 1838 ; but they did not fulfil the contract by paying for the labor of the convicts according to the terms thereof. On the contrary the monthly balances against them commenced and continued to increase, from the 30th of June, 1837, until they amounted to nearly three thousand dollars. On the 31st of August, 1838, Palmer & Seymour the assignees sold and assigned to Halsey Phelps all their interest in the contract, and all their claim and right to have the same renewed ; but upon condition that the assignee should pay the agent for all future services of the convicts and should fulfil the covenants as to the time for which the contract was yet to run. And on the 4th of September thereafter Phelps made a similar assignment of all his interest in the contract to the complainant ; he fulfiling the covenants and obligations assumed by Phelps, and saving him harmless from the same. The

agent of the prison assented to both of these assignments by written assents endorsed on the contract. And for the last assignment the complainant gave to Halsey his bond for $1000 in anticipation, as he alleged, of a renewal of the contract under the clause giving a preference. The agent, as a condition of giving his assent to this assignment to the complainant, required him to agree that he would make an offer for the future services of the convicts, under the proposals which were then being published agreeably to the provisions of the act of March, 1837, a sum not less than the old prices for their labor; and also an offer to pay the balance due from the original assignees of the contract, which was then supposed to be about $4000 exclusive of interest. In July, 1838, the agent, among other things, advertised for proposals, to be received until the 25th of September, for the labor of from fifty to seventy convicts from three to five years from the first of November thereafter. And on the 24th of September the agent received from the complainant an offer, for the same prices as under the old contract; that is 35 cents for 50 convicts who had learned the trade, and 25 cents for ten convicts of the inferior capacity as stated therein, and to secure the balance due from the original assignees of the old contract. The complainant also added a clause to his proposals, for the purpose of entitling him to a renewal of the old contract, that he would give for the services of the convicts as much, *all things considered,* as should be offered by any responsible person. On the same day the defendant Parsons, who made the offer in his own name but in fact for himself and Hewson the other defendant, put in proposals to give 45 cents per day for those who had learned the trade, and 27 cents for the second rate hands. These were all the proposals offered for the services of convicts for the cabinet makers' work, previous to the meeting of the board of inspectors on the 25th of September to decide upon the proposals; at which time those proposals were opened and laid before the board of inspectors. On the next day, and before the inspectors had decided upon the proposals received, the complainant sent a communication to the agent insisting that his proposal, including the old debt, was

equal to 45 cents per day for the first class of men and 35 for the second class; or that it was at all events an offer to give as much as any other responsible person had offered. He therefore claimed the contract according to the stipulation in the original agreement. On the next day, but after the board of inspectors had determined to give the new contract to Parsons, as the one whose proposals were the most beneficial to the state, and after an order to that effect had been made by them, the complainant delivered another written proposal to the agent; offering the same that Parsons had offered previous to the opening of the proposals. And he again claimed the right to the contract under the stipulation for a preference contained in the original agreement. But the agent, in conformity to the decision and order of the inspectors, concluded the contract with the defendants Parsons & Hewson, for the labor of fifty convicts of the first class, and ten of the second class, for the term of five years from the first of November, 1838, at the prices proposed by Parsons. The complainant, upon these facts, prayed that the contract between the agent of the prison and Parsons & Hewson might be annulled; and for a specific performance of the covenant of renewal, and that he might have the new contract according to his proposals. He also prayed for a preliminary injunction to restrain the agent of the prison, and Parsons & Hewson, from letting or hiring the convicts or contracting for their employment in the cabinet or chair making business, with any person other than the complainant: and from employing them in that business, or removing or in any way interfering with his stock, tools, fixtures, or other property, in the prison.

*M. Hoffman*, for the complainant.

*B. F. Butler*, for the defendants.

THE CHANCELLOR. Independent of the questions arising upon the merits of this case, there are very great difficulties in the way of granting the preliminary injunction as asked for by the complainant; the immediate effect of which

would be to throw these convicts out of employment, in violation of the laws of the state which require them to be kept at hard labor pursuant to their several sentences; or to compel the officers of the prison to continue them in laboring for the complainant without any contract having been made with him for their employment, and without the assent of the inspectors who alone have authority to permit a contract to be made by the agent under the existing law. It is also in effect a bill to compel a specific performance of a contract made by the state, and in its name, by the former agent of the prison. I am therefore inclined to think that the attorney general, and probably the inspectors of the prison under whose authority the new contract was made, are necessary parties to the suit, if the complainant is entitled to any relief upon the case made by the bill. At all events it was not a case in which even a temporary injunction should have been granted by an officer out of court, or by the court itself, without giving the defendants a chance to be heard. For this reason I directed the injunction allowed by the master to be immediately dissolved, so far as it prevented the agents and officers of the prison from keeping the convicts at labor according to law. And I regret to learn that, owing to some inadvertence in the form of the order, the temporary injunction was not so far dissolved as to allow the agent to continue the prisoners at labor for either party, as the inspectors should think proper to direct, until this application for a general preliminary injunction was disposed of by the court.

The conclusion at which I have arrived upon the merits of this case, induces me to overlook all questions of mere form in the bill, and the question as to the propriety of granting an injunction in such a case until the court by decree has directed the contract between the defendants to be cancelled, and a new contract to be made with the complainant under the direction of the inspectors, pursuant to the last proposal of his as stated in the bill. It may be proper, however, to observe, in answer to an objection that this court has not jurisdiction to decree a specific performance of a contract relating to labor or to personal property, that

1838.

Jones
v.
Lynds.

if any suit could be brought upon this contract to compel a performance of the covenant of renewal, it must be in this court. No suit at law could be brought against the present agent of the state prison upon a contract made by his predecessor for and on the behalf of the people of the state; and the people themselves cannot be sued in any court for damages merely.

There are several objections to the complainant's right to a decree for a specific performance in this case, independent of questions of mere form, either of which I think sufficient to deprive the complainant of the relief asked by his bill. The bill is framed upon the supposition that the assignee of the contract is entitled to a specific performance of the covenant of renewal, without a compliance with the terms of the contract as to the payment for the labor performed by the convicts under that contract previous to the assignment to Philips from whom he purchased. In this respect the complainant has been wrongly advised. This court does not decree the performance of a contract in favor of one of the parties thereto, or of his assignee, without requiring the performance by such party, or his assignee, of the several covenants and conditions in the agreement in favor of the party against whom the specific performance is sought. And although by the terms of the assignment the assignee may not be personally liable to the adverse party for a breach of the stipulations of the assignor in favor of such adverse party, yet when he seeks to compel a specific performance of the contract he is bound to comply with all the conditions thereof in favor of the adverse party, in the same manner as the assignor would himself have been compelled to do if the contract had not been assigned. In other words, the assignee of the contract takes it subject to all equities which existed between the parties thereto arising out of such contract. And the court will require him to perform all the stipulations which the assignor was bound to perform in favor of the adverse party, to entitle him to a decree for a specific performance. (*Murray* v. *Gouverneur*, 2 *John. Ca.* 438.) The only exception to this rule of which I am aware, is where the party against whom a specific

performance is sought by an assignee of the contract, has made some agreement with the assignee, or has done some act by which the stipulations in the original contract in favor of such party have been waived or abandoned. But in the present case the agent of the prison has done no act by which the assignee was entitled to a renewal of the contract without paying what was due thereon for the labor of the convicts previous to the assignment of the contract to Philips. On the contrary it appears from the complainant's bill that the agent, before he would give his consent to the assignment of the contract to the complainant so as to give him the chance of obtaining a renewal upon the offer of as much as any one else under the stipulation in the contract, not only required that he should make an offer at least equal to the old contract price, but also that he should agree to pay what remained due for the labor of the convicts previous to the assignment to Philips. It is true those who assigned the contract to Philips did not require him to pay for the previous labor of the convicts; and therefore, as between him and his assignors they were bound to pay up the arrearages then due, so as to give him the full benefit of the assignment upon his paying for the subsequent labor of the convicts. The complainant also took his assignment from Philips on similar terms. But the agent was not a party to those arrangements of the assignors and assignees as between themselves. Neither was his assent to those assignments given for the purpose of sanctioning those arrangements, as appears by the terms he imposed upon the complainant as a condition of his assent to any asssignment of the contract. His formal assent to the assignments was given because by the terms of the contract it was not assignable without such consent. It would also have been a violation of the official duty of the agent to have waived performance of any condition in the contract in favor of the state, for the purpose of giving the right of the renewal of the contract to the assignee without a performance of the conditions of the contract in full. The tenth section of the act of May, 1835, had made it the duty of the agent to avail himself of every opportunity that might occur to change the

contracts, so as to make them conform to the principles of that act for the future employment of convicts. And one of those principles was that in all contracts for the future employment of the convicts there should be a chance for an equal and fair competition between persons wishing to obtain such contracts; though it is probable this tenth section was more particularly intended to apply to the clause in this and other contracts relative to the learning of certain trades to new convicts, who had not already learned such trades, contrary to the principle of the seventh section of the act. (*Laws of* 1835, *p.* 312.)

Again; neither the complainant nor Philips could, either legally or equitably, be considered as the assignee of the contract for the purpose of entitling him to a specific performance of it, without a compliance with the conditions thereof so far as related to the payment of the arrears due for the labor of the convicts subsequent to the assignment to W. A. Palmer and Jesse Seymour; as that assignment was upon an express condition that they should fulfil and perform all the covenants and agreements therein which the original contractor was bound to perform. To entitle the complainant, therefore, to claim through that assignment, so as to give him the benefit of the covenant of renewal, it was necessary for him to comply with that condition; otherwise the assignment through which he claimed would be avoided for the breach of such condition, and the original contractor and his sureties, who were still liable for the labor of the convicts upon the contract, would be entitled to the benefit of the covenant of renewal for their indemnity. For these reasons I am of the opinion that none of the offers of the complainant would have entitled him to a renewal, even if the law as to the manner of making such contracts had not been changed, as he did not offer to fulfil the terms of the original contract in addition to the offers to take the new contract upon as good terms for the state as those offered by Parsons.

Even if he was not bound to pay the arrears due upon the contract, I do not consider either of the complainant's offers as entitling him to the new contract, under the

agreement stated in his bill as having been made with the agent at the time he assented to the assignment. At that time the complainant knew, or at least he must legally be presumed to have known, that by the acts of May, 1835, and March, 1837, the agent could not make a contract for the employment of the convicts without the direction of the inspectors, nor without giving two months notice of the time and place of letting the contract. He must also have seen the notice stated in his bill, and which had then been running more than a month, that sealed proposals would be received by the agents until the 25th of September for contracts for the employment of the convicts. The legal effect of the arrangement with the agent, therefore, must have been that he was, in order to entitle him to a preference, to put in proposals, under the notice that was then running, in such a way as to give the state the benefit of his fair competition with others who might put in proposals in pursuance of such notice ; and then if his proposals, including the offer to pay the old debt, had been as good though not better than those of any other person, the inspectors would probably have given him the preference ; especially if there was no hope of collecting that debt from those who were legally liable for the same. The first offer, specified in his proposals of the 24th of September, which were the only proposals from him that were received in time, within the spirit and intent of the notice, was an offer for the new contract according to the meaning and effect of the arrangement made with the agent. But unfortunately it was not as beneficial for the state, by several thousand dollars, as the offer made by Parsons, even if the balance of $4000, which was then supposed to be due from Palmer & Seymour, is added to the contract price of labor as offered. The labor of the convicts would probably be about twenty-five days per month for each man, making a reasonable allowance of one day each for sickness and other accidents. The labor of the whole sixty convicts, at the prices of thirty-five cents and twenty-five cents, as specified in the assigned contract, would be but $500 per month, or $30,000 for the five years ; while at the prices of forty-five cents and twenty-seven cents, as

offered in the proposals of Parsons which were accepted by the inspectors, the labor of the sixty would be $530 per month, or $37,800 for the whole term. This would make a difference in favor of the proposals of Parsons of $3800, even if the amount then supposed to be due on the old contract is added to the prices as offered by the complainant. And if only the actual amount due upon the old contract is added, the difference in favor of Parsons' proposals will be about $1000 more. An offer, in sealed proposals of this kind, to give as much or more than any other person who shall send in proposals, is not the offer of any price within the meaning and intent of the notice under which such proposals are to be made ; as the necessary effect of receiving such a proposal would be to prevent fair competition for the contract. The inspectors were therefore right in rejecting the last branch of the complainant's offer under this notice. Neither were the inspectors bound to take into consideration either of the complainant's offers which were made subsequently to the time when the sealed proposals were opened so that their contents could be known.

Again ; the complainant, in any event, was only entitled to a renewal of the old contract, for the further term of five years, upon his offering as good terms as any other responsible person, *provided the agent should make such a contract with any one.* But no such contract as that of which a renewal is sought has been or could have been made by the agent subsequent to the act of May, 1835. And no reasonable doubt can be entertained as to the constitutional power of the legislature to prevent the renewal of this contract, by depriving the agent of the power of making such a contract either with the assignee of the original contractor or any one else ; as such a contingency is provided for by this proviso in the renewal clause. In the first place, the agent is now prohibited by law from making any contract for the labor of the convicts, for more than six months, without the consent and direction of the inspectors, under an order or resolution of the board to be entered in their minutes. If this contract with Parsons & Hewson was rescinded, therefore, the agent could not be decreed to make a similar

contract with the complainant, in direct violation of the statute on the subject, without first making the inspectors parties to the suit and compelling them to enter a resolution authorizing and consenting to the making of a contract by the agent. It will also be perceived that the original contract, of which the complainant now seeks a renewal, is not such a contract as the agent, even with the consent and by the order or direction of the board of inspectors, could make with the complainant or any one else under the existing laws of the state ; and that the contract which the agent has been authorized and directed to make under Parsons' proposals is materially different, in one respect at least. The contract with John Seymour was for fifty convicts, who were either cabinet and chair-makers by trade or who were capable of being learned that trade ; and the contract price, for the first month, for those who had not yet learned the trade, was to be but half the price of those who were already instructed therein. It was therefore a contract for the services of those convicts who were already mechanics, and also for raw hands to be instructed in the trade. But by the existing law, the agent and officers of the prison are prohibited from allowing convicts to be learned any mechanical trade except the making of those articles of which the chief supply for the consumption of the country is imported. It is not competent therefore, at this time, to contract for the labor of convicts who are not cabinet and chair-makers, to be employed in that business, as they were contracted for under the agreement with Seymour. The agent, therefore, had not been and could not be authorized to make such a contract as the old one was in this respect ; and the complainant, by the terms of the covenant, is not entitled to have such a contract renewed. It is certainly to be regretted that the complainant has been induced to pay so large a sum for the assignment of this contract under a misapprehension of his rights under this renewal clause ; but the inspectors and agent of the prison have done no more than their duty, under the existing laws of this state, in giving the new contract to the highest bidder under their published notice for proposals.

The motion for an injunction must therefore be denied, with costs to the defendants, to be taxed ; and the temporary injunction allowed by the master, so far as it is still in force, must be dissolved.